COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH


NO. 2-07-279-CV

IN THE INTEREST OF J.S.,
M.N.S.C., AND T.S.,
CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

**Introduction**

Appellant N.S. appeals the trial court's order terminating her parental

rights to her children, J.S. (John), M.N.S.C. (Mary), and T.S. (Tom).[2]  In two

---

[1] *See* TEX. R. APP. P. 47.4.

[2] We are using fictitious names in accordance with proposed TEX. R. APP. P. 9.8, 71 TEX. B.J. 287-88 (Tex. 2008, scheduled to take effect Sept. 1, 2008).

issues, appellant argues that the evidence is legally and factually insufficient to support the trial court's best interest finding.  We affirm.

## Background Facts

On February 24, 2006, appellant took her two-and-a-half-year-old daughter Mary to the emergency room because she had stopped breathing. Appellant told doctors that Mary had fallen off the bed and that she might have consumed dish soap.  Doctors, however, believed that Mary was intentionally injured due to her numerous, severe injuries.  Dr. Steven Perilman, the pediatric emergency physician at Cook Children's Hospital who examined her, testified that she had left-sided phoresis, a condition which caused the left side of her body to be noticeably weaker compared to the other side.  Mary also had a subdural hematoma, which was life-threatening and required emergency surgery.  The subdural hematoma was putting enough pressure on her brain to cause her right eyelid to not open properly, a condition known as ptosis, which caused a loss of consciousness.  If symptoms such as ptosis persisted, swelling and pressure on the brain would push on the brain stem and stop the cardiorespiratory part of the brain.  During Mary's emergency brain surgery, doctors also discovered a previous head injury.  Doctors believed that Mary's brain bleed was caused by shaking.

2

Additionally, Dr. Perilman testified that Mary had a small bruise on her left chin, a bruise on the midline of her lumbar spine area, a very severe diaper rash that caused the outer layer of her skin to burn, intraoral burns, burned tonsils, white-coated ulcers on both sides of her soft pallet, swollen lips, and fractures on the middle and ring fingers of her left hand. On February 27, 2006, TDFPS removed Mary from appellant's care as well as her four-year-old brother, John.[3]

Detective Wayne Goodman with the North Richland Hills Police Department arrived at the hospital after Mary's surgery to investigate. He spoke with appellant who claimed that Mary had fallen out of bed and had consumed dish soap. After Detective Goodman explained to appellant that Mary's injuries were inconsistent with her explanation, appellant blamed her live-in boyfriend Mark McBride.[4] However, when Detective Goodman interviewed appellant again on March 27, 2006, she told him that McBride had nothing to do with the injuries, and she reiterated her initial explanation.

At the time of the incident, appellant lived with McBride, her two children Mary and John, and McBride's adult daughter, Allison. Appellant told Detective Goodman that McBride got up with the children around 6:00 a.m. and took care

---

[3] John was diagnosed with cerebral palsy at the age of one and a half.

[4] McBride was incarcerated at the time of trial.

of them until she woke up around 11:00 a.m. Appellant stated that McBride left the home but later returned. Sometime in the afternoon, Mary began to vomit and have uncontrollable diarrhea. When Mary became limp, appellant took her to the emergency room. Detective Goodman was unable to eliminate appellant, McBride, or Allison as the person responsible for Mary's injuries.

TDFPS placed Mary with foster parents, D.S. and C.C., as soon as she was released from the hospital. D.S. testified that Mary's condition was shocking. Mary was inconsolable and cried for five days. She was very frail and in pain; D.S. also said that Mary's diaper rash was horrid and that she could not make her comfortable. D.S. also testified that, at the time of trial, Mary was doing miraculous despite the fact that she still had a lot of pain in her head and had nosebleeds every night. D.S. stated that Mary needed a structured environment and learned by repetition. Mary threw tantrums easily if disrupted and had difficulty expressing herself although her vocabulary had doubled. Additionally, Mary would need another surgery on her skull, and because she was susceptible to injury, she wore a helmet when playing outside.

D.S. testified that John arrived in their home three days after Mary. Although John was four years old, he was still in diapers and ate with his fingers. He crawled with his fingers tucked under his knuckles and did not have the balance or coordination to stand by himself. At the time of trial, John was

4

potty-trained. John had also learned to crawl properly and had been fitted with leg braces. He had progressed to a walker and was also fitted for a brace on his right hip. Additionally, John wore special splints at night. He had also learned to eat with a fork and spoon and was in speech therapy.

D.S. also testified that John tried to avoid visits with appellant. For example, he had learned how to ask to go to the bathroom to escape spending time with appellant. He also experienced anxiety and panic attacks. For example, he experienced anxiety about going to school, and D.S. had to reassure him that she would return to pick him up.

Additionally, D.S. testified that John had acted out sexually. For example, D.S. discovered her adopted son lying on John's bed with his pajamas off while John was playing with his foster brother's penis, calling it a "shooter." After this incident, D.S. contacted the caseworker, filed a report, gave the boys separate bedrooms, and monitored their activities with an open door policy. D.S. also testified that once when she and John were in the car, John told her that Daddy Mark had a big shooter and that he had a little shooter. John told her that Daddy Mark would touch him with his big shooter, touch his bottom with his big shooter, and urinate on him.

Shirley Poeck, John's therapist, testified at trial that she had been counseling John since January 2007. John began counseling after he acted out

5

sexually with his foster brother and because of anxiety over the safety of his siblings. John called his siblings "my children," and he felt like he was their protector. For example, John wanted to know how to use a telephone because he wanted access to grown-ups things, which gave him a sense of being able to protect his siblings. Poeck testified that she believed John had been sexually abused because of the actions he had demonstrated. John also did not want to go to visitation with appellant, and he had anxiety about it. Poeck testified that she believed it was in John's best interest to remain with his foster family.

While Mary and John were living with their foster family, appellant had another child, Tom.[5] TDFPS did not know about Tom's birth until twelve days after he was born; TDFPS then removed Tom and also placed him with D.S. and C.C. D.S. testified that Tom was developmentally delayed and, at the time of trial, was receiving occupational and physical therapy twice a week. D.S. also testified that she and C.C. would like to adopt all three of the children.

Jessica Puryear, the TDFPS caseworker assigned to this case, testified that appellant had worked her services, but she still had concerns about appellant's ability to parent. Appellant's service plan included parenting

---

[5] Tom's father is McBride, and he executed an affidavit of relinquishment.

classes, anger management, individual therapy, and a psychological evaluation; appellant completed all of these services.

Additionally, Puryear also asked appellant to educate herself about cerebral palsy and shaken baby syndrome, which appellant did. Appellant regularly visited the children, and Puryear stated that on most occasions she did well with the visits and acted appropriately. Although appellant struggled with balancing the children's needs when all three children were present, she tried to apply what she had learned in the parenting classes. For example, appellant brought the same toys to visits each week to establish consistency.

Appellant also maintained steady employment. She worked at Man's Best Friend from July 2006 until recently when she got a new job as a restaurant hostess in downtown Dallas. Initially, appellant lived in Tarrant County, but she moved to Dallas to be closer to her new job and the location of the visitations. Puryear also testified that appellant was good about staying in touch with her. Although appellant had learned some parenting skills, she could not provide TDFPS with a clear plan on how to meet the children's medical and physical needs. For example, appellant did not have beds or rooms for them when Puryear last visited appellant's apartment.

Although appellant worked her service plan, Puryear recommended that appellant's parental rights be terminated because of the number of injuries Mary

7

sustained, the uncertainty regarding who caused the injuries, and the amount of neglect experienced by the children.

Susan Chapman, a supervisor at Child Advocates of Tarrant County, testified that it was inconceivable that appellant did not know about Mary's injuries. She stated that appellant committed the injuries herself or was in the house when the injuries occurred because Mary would have been screaming. Chapman attended visitations and stated that appellant usually brought her mother and her sister with her. Normally, appellant's mother or sister would feed Tom, but sometimes appellant would also feed him. She testified that appellant did engage with the children, but her role was passive. Chapman also said that the children interacted and were attached to their foster family. Chapman recommended that appellant's parental rights be terminated and that it was in the children's best interests to stay with the foster family.

The termination bench trial was held on July 17 through 19, 2007. Nancy McNeil, a pediatric nurse practitioner who worked at a specialty clinic for foster children, testified that she first saw John on March 10, 2006. She testified that John had significant gross motor delays because of his cerebral palsy, which affected his legs. At that time, John was four years old and not walking, and he could not go from a kneeling position to crawling or sitting up by himself, which children usually accomplish at nine months. John was also

8

unable to use his arms effectively like a toddler, and he did not have the ability to pull himself on a toy or pull his legs up so that he could ride a toy or truck. Although John was articulate, McNeil testified that he was actually only repeating what others said without understanding.

McNeil last saw John on February 2, 2007, and she testified that he had made great strides with his physical development. He was in physical and occupational therapy and had received Botox injections to help with his mobility. Additionally, he used a walker and had a motorized wheelchair; John also had braces and could stand by himself. John's language skills had also improved greatly.

McNeil first saw Mary on March 3, 2006, and she was below the third percentile for weight. At the time of trial, however, she was above the twenty-fifth percentile and had grown rapidly. Because of Mary's surgery, her skull plate was gone, so she had no protection on that area of her head. Any roughhousing or swinging was discouraged because if she hit her head, it would be dangerous. McNeil did not know the extent of the damage due to the brain hemorrhage; doctors would have to continue to monitor her.

McNeil saw Tom when he was two weeks old, and she felt that he had not gained the appropriate amount of weight for a newborn. However, Tom had steadily gained weight since being with the foster family.

9

McNeil testified that the children were getting loving care in their foster home; they were bonded to the foster parents and had a warm attachment to them. They were happy, thriving, and well-behaved. McNeil testified that it was in the children's best interest that they remain together in the foster home.

Appellant, who was twenty-two at the time of trial, testified that she became pregnant with John when she was sixteen years old.[6] When John was one year old, appellant met M.C. on the Internet; appellant left John with her mother for six to nine months so that she could work and save money to move in with M.C. Appellant saved money and she, John, and M.C. then lived together in Missouri. Appellant and M.C. had Mary in 2004. Appellant testified that M.C. was physically, emotionally, and sexually abusive; he choked her and left bruises on her arm. In September 2005, appellant met McBride at a Cracker Barrel, where she was working at the time, and he helped her get away from M.C. She testified that she knew McBride had a criminal background, but she did not know the specifics. McBride and appellant moved to Texas with John and Mary.

---

[6] Appellant testified that John's father, N.J., was verbally abusive and that she never lived with him. She did not know where N.J. was located. N.J. was not present at trial.

Appellant testified that on February 24, 2006, she was at home with her children. McBride was also home on and off that day, and he told her that Mary was fine when she woke up. Appellant said she did not notice that Mary was sick until later in the day when she started vomiting and having diarrhea. Mary became cold and then stopped moving or breathing, so appellant took her to the emergency room. Mary had not been crying until she began to vomit. Appellant testified that she had no idea what happened to Mary. She also stated that she knew about Mary's diaper rash but that she did not have any money or a car to take Mary to a clinic. She testified that it bothered her that she did not know who hurt her daughter.

Appellant testified that she was dating someone, but she had not told TDFPS. She said that she would not allow any men around her children. She stated that her boyfriend gave her a car to use.

Appellant also testified that she helped TDFPS get Mary's medical records from Missouri. John went to therapy in Missouri, but not after they moved to Texas because she did not have a car or control over anything. She said that she did John's exercises with him at home. Before her children were removed, she had contacted Scottish Rite Hospital to get therapy for John.

Appellant completed parenting classes, anger management classes, and regularly visited her children. She testified that she was better equipped to

11

provide a safe and stable home for her children. Appellant stated that she wanted to go back to school and have someone come into her home and teach her the physical therapy that John needed. She wanted to take them to school, and she would adjust her work schedule. She also stated that she wanted to go to family counseling. Appellant testified that she visited a therapist once a week, had worked on her issues with men, and had learned to identify signs of an abusive relationship. She had learned to not be dependent on anyone else.

Although appellant was not working at the time her children were removed, she got a job at Man's Best Friend, which was a kennel and dog training facility. She worked there for a year, but she left in April 2007 so she could move to Dallas to be closer to visits. Appellant testified that she had a job as a hostess at a restaurant in downtown Dallas. She stated that she worked forty hours a week for ten dollars an hour. She had a two-bedroom apartment in Dallas. At the time of trial, appellant testified that her mother and her sister were living with her, but her sister would be moving out in the next week. Appellant testified that she was the primary person who paid the bills.

Carol Lennox, appellant's therapist, testified that she had been seeing appellant since March 30, 2006, and she believed appellant had made amazing progress. Lennox also testified that appellant had been consistent and cooperative, maintained employment, and completed parenting classes and

12

anger management classes. She stated that appellant's dedication to therapy was unusual.

Lennox stated that she was not aware of appellant's living situation, but she believed that appellant was capable of providing a safe home for her children and that appellant was not the same person she was a year ago. Additionally, Lennox testified that she and appellant discussed appellant's abuse as a child by appellant's mother's live-in boyfriend.

Although Lennox was aware that Mary's perpetrator was not ascertainable, she did not believe that appellant's parental rights should be terminated because she had made progress rarely seen and showed tremendous concern for her children. She and appellant had discussed several options such as John's returning to appellant while the younger children could be adopted by the foster parents. Lennox testified that this was better than termination although she agreed it was not good for the children to be separated. She also testified that they had discussed open adoption, which would allow appellant to see her children once a month unsupervised.

Mila J., Mary's paternal grandmother who lived in Hot Springs Village, Arkansas, testified that appellant called her in February 2006 and told her that Mary was in the hospital and that TDFPS had taken John. Mila had not heard from or seen appellant or her grandchild since appellant left M.C. in September

13

2005. Appellant had emailed Mila, but Mila did not know where they were. Mila testified that she was close to John and Mary and that she was concerned about John when he was not walking at two and a half. She had witnessed appellant and M.C. doing exercises with John and knew that John had leg braces.

TDFPS gave Mila and her husband, Buford, permission to visit the children in March 2006. They then contacted a lawyer in July or August 2006 to try to get custody of Mary.[7] However, Mila testified that she and her husband had established a bond with the foster family as had the children, and she did not think it was in the children's best interest for them to be separated.

After a three-day bench trial, the trial court determined that appellant (1) knowingly placed or knowingly allowed her children to remain in conditions which endangered their physical and emotional well-being, (2) engaged in conduct or knowingly placed her children with persons who engaged in conduct which endangered their physical or emotional well-being, and that (3) termination was in their best interest.[8] *See* TEX. FAM. CODE ANN.

---

[7] Mila and Buford filed a suit in intervention for access to Mary if M.C.'s and appellant's parental rights were terminated. The trial court granted them reasonable visitation.

[8] The trial court also terminated N.J.'s parental rights to his son John, M.C.'s parental rights to his daughter Mary, and McBride's parental rights to his

§§ 161.001(1)(D), (E), (2) (Vernon Supp. 2007). Appellant timely filed this appeal.

### Statement of Points

As a preliminary matter, we address the State's contention that appellant's issues in her statement of points and motion for new trial are too vague and lack specificity. Section 263.405(i) of the Texas Family Code provides,

> The appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial. For purposes of this subsection, a claim that a judicial decision is contrary to the evidence or that the evidence is factually or legally insufficient is not sufficiently specific to preserve an issue for appeal.[9]

The relevant portions of appellant's combined motion for new trial and statement of points allege that the evidence is legally and factually insufficient to support the trial court's findings: (1) that she knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being, (2) that she engaged in conduct or

son Tom. None of them have appealed the trial court's order.

[9] TEX. FAM. CODE ANN. § 263.405(i) (Vernon Supp. 2007); *see also In re S.B.,* 207 S.W.3d 877, 881 (Tex. App.—Fort Worth 2006, no pet.); *In re D.A.R.*, 201 S.W.3d 229, 230 (Tex. App.—Fort Worth 2006, no pet.) (both analyzing this statute).

15

knowingly placed her children with persons engaged in conduct which endangered their physical or emotional well-being, and (3) that termination of the parent-child relationship was in John's, Mary's, and Tom's best interest.

Here, appellant's statement of points identifies the challenged trial court's findings, outlines the elements of those findings, and raises legal and factual insufficiency claims. Thus, appellant's statement of points was specific enough to allow the trial court to correct any erroneous findings on the challenged grounds. *In re J.W.H.*, 222 S.W.3d 661, 662 (Tex. App.—Waco 2007, no pet.); *In re A.J.H.*, 205 S.W.3d 79, 80 (Tex. App.—Fort Worth 2006, no pet.). We therefore address appellant's legal and factual sufficiency challenges to the best interest finding.[10]

### Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). While parental rights are of constitutional magnitude, they are not absolute.

---

[10] Even though appellant raised sufficiency challenges to the trial court's endangerment findings in her combined motion for new trial and statement of points, on appeal she challenges only the legal and factual sufficiency of the evidence to support the trial court's best interest finding.

16

Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently — to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp. 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20-21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

**A. Legal Sufficiency**

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have

18

disbelieved.  *Id.*  We must consider, however, undisputed evidence even if it is contrary to the finding.  *Id.*  That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not.  *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict.  *Id.*  But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province.  *Id.* at 573, 574.  And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable.  *Id.* at 573.

**B. Factual Sufficiency**

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own.  *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the termination of the parent's parental rights would be in the best interest of the child.  *C.H.*, 89 S.W.3d at 28.  If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding,

19

then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266-67.

### Applicable Law

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1)   the desires of the child;

(2)   the emotional and physical needs of the child now and in the future;

(3)   the emotional and physical danger to the child now and in the future;

(4)   the parental abilities of the individuals seeking custody;

(5)   the programs available to assist these individuals to promote the best interest of the child;

(6)   the plans for the child by these individuals or by the agency seeking custody;

(7)   the stability of the home or proposed placement;

20

(8)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**Analysis**

**A. Desires of the children**

At the time of trial, John was five years old, Mary was three years old, and Tom was eight months old. Caseworker Puryear testified that most of the time, the children were excited to see appellant. Foster parent D.S testified that Mary enjoyed seeing appellant because appellant brought food to the visits, and Mary liked to eat. Puryear also testified that the children were bonded with appellant. Appellant testified that John asked her if he could come live with her when he was bigger. However, D.S. testified that she had never heard John

21

tell appellant that he wanted to live with her. Instead, she testified that John had anxiety and panic attacks before visitations and that he tried to get out of visiting with appellant. In the two weeks before trial, John would scream for an hour on the days that he had visits with appellant. Chapman testified that during the last visit between appellant and the children, she could tell that John was upset and did not want to be there. She stated that John was very anxious and wanted to leave. Appellant tried to give John some money to divert his attention, which briefly calmed him down, but he left the visiting room as soon as the visit was over.

John's therapist Poeck also testified that John did not want to attend visits and that he had increased anxiety about going to visits with appellant; further, John had started to have stomach aches, which indicated his anxiety about visiting his mother had become physical and not just behavioral. Additionally, when he was at a visit, John would look for his foster mother, and if he could not hear or see her, he would have to go find her, which was a form of separation anxiety. Poeck also testified that John had never said anything to her to make her think he was bonded with appellant, and she believed John could move on without appellant because he had become strongly bonded to his foster family. Poeck stated that John needed closure so that his separation anxiety would not get worse.

22

There is also evidence that John would like to be adopted by his foster family. D.S. testified that when she and her partner adopted their other two children, they celebrated a "Forever Day" to signify the day the child was brought into their family. They took a "Forever Day" photograph so that their children would remember the day they became a part of their loving family. D.S. testified that John had asked for a "Forever Day" photograph on many occasions.

The evidence shows that John was not benefitting from visits with appellant. Additionally, it would be detrimental to the children, and especially John, if they were separated. Further, it was in the children's best interest to stay together in their current environment because they had bonded with their foster family.

**B. The emotional and physical needs of the children now and in the future, and the emotional and physical danger to the children now and in the future**

The evidence demonstrates that Mary had suffered numerous intentionally inflicted injuries, the most severe of which was a subdural hematoma that required emergency brain surgery. In addition, Mary had bruises on her chin and back, burns in and around her mouth, burned tonsils, ulcers, and a severe diaper rash. Doctors also discovered untreated past injuries that were likely caused by shaking, and the surgery left a portion of her skull unprotected.

Additionally, Mary was underweight and had problems eating. For example, she would continue to eat until she was sick. At the time of trial, although Mary had nightly nosebleeds and headaches, she had grown and was doing great physically and emotionally.

John has cerebral palsy, which had been untreated and caused significant developmental delays. When John was first removed, he was barely mobile, in diapers, could not use his arms effectively, and could not dress or feed himself; however, since being with his foster family, John had been potty trained, could walk with the assistance of braces and a walker, and could feed and dress himself. John had also received speech, physical, and occupational therapies and made great strides in his physical development. There is also evidence that John was sexually abused.

TDFPS did not know appellant was pregnant with Tom until August 2006, and appellant did not tell her caseworker when Tom was born in November 2006. Before being removed, Tom had not gained weight, and pediatric nurse McNeil was concerned that appellant had not sought prenatal care. Appellant's therapist Lennox, however, testified that she thought appellant had received prenatal care. TDFPS removed Tom because he was at risk due to the severe neglect of John and the injuries to Mary. Since living with the foster family, Tom had not encountered any weight issues.

24

The evidence shows that appellant had maintained adequate housing and steady employment. Appellant initially lived and worked in Tarrant County, but she moved to Dallas after finding a better job and to be closer to visits with her children. Puryear testified that she knew appellant had gotten a new job in Dallas but did not know that she had moved until she read Lennox's report in June. At the time of trial, appellant lived in a two bedroom apartment in Dallas with her mother, sister, and sister's baby. Although the apartment was not dirty when Puryear visited, she testified that there were no beds set up for the children and that medication was within John's reach. Appellant, however, testified that she had two twin beds and a baby bed for her children. Puryear did not believe appellant's home was ready for children based on the condition of her apartment. The evidence also shows that appellant paid her bills and had reliable transportation.

TDFPS was also concerned about appellant's mother living with her because appellant's mother continued to live with appellant's abuser after learning about the abuse. However, appellant confronted her mother, and appellant testified that her mother was not a danger to her children.

**C. The parental abilities of the individuals seeking custody, and the programs available to assist these individuals to promote the best interest of the children**

The evidence demonstrates that appellant worked her service plan. Appellant completed parenting classes, anger management classes, individual therapy, and a psychological evaluation. Lennox testified that appellant attended individual therapy sessions regularly, was diligent about working on her personal issues, and had accepted responsibility for her children's injuries and neglect.

Nichelle Wiggins performed a psychological evaluation on May 9, 2007. Wiggins testified that appellant had a low/average IQ; appellant could learn new information, but it might take her extra time. Appellant's reading and spelling skills were at a high school level, and math was her weakness. Wiggins also testified that appellant had maintained employment for the past nine months, was seeking help for her depression, and never had an alcohol or drug abuse problem. Wiggins stated that appellant had major dependency issues, was passive, and tended to get involved with men who were abusive. She also testified that appellant had poor self-esteem and a dependent personality disorder. Wiggins noted that appellant displayed significant symptoms that required treatment, but she was still able to function; she testified that appellant needed psychiatric intervention and counseling. Additionally, Wiggins said it was a strength that appellant had been consistently going to counseling. However, one of her concerns was that appellant became involved in

26

relationships that were destructive and led to poor decision making. Wiggins also testified that she was concerned about appellant's ability to protect her children in the future and accept responsibility for maintaining their safety. Appellant's dependency issues and history of abusive relationships were also concerns for Wiggins. As of the date of appellant's evaluation, Wiggins thought the children should remain in protective care.

The record shows that appellant had a history of abusive relationships, which caused TDFPS concern that she would enter into future unhealthy relationships. Additionally, appellant did not tell TDFPS about her relationship with her new boyfriend, Allen B., which appellant should have realized was an important issue about which TDFPS needed to be informed. Although Lennox knew of the relationship, she testified that she did not believe appellant was at risk to become involved in another harmful relationship.

The record contains evidence that Lennox believed appellant had made significant progress and had the ability to parent her children. Puryear and Chapman, however, disagreed with Lennox's evaluation and believed appellant's parental rights should be terminated. The trial judge as fact-finder was free to assess the credibility of Lennox, Puryear, and Chapman. *See J.P.B.*, 180 S.W.3d at 573.

27

The record also demonstrates that appellant regularly visited her children and applied the skills that she had learned in the parenting classes. However, John was anxious about visitations and avoided spending time with appellant.

Although appellant completed all of her services, TDFPS was not able to recommend returning the children to appellant because of the extent of Mary's injuries and John's medical neglect. Furthermore, appellant had not provided TDFPS with a plan on how to meet the children's medical needs in the future.

**D. The plans for the children by these individuals or by the agency seeking custody, and the stability of the home or proposed placement**

Regarding future plans for the children, TDFPS's goal was to have the foster family adopt all three children. D.S. testified that she and C.C. would like to adopt the children and that they considered John, Mary, and Tom part of their family. Mary's grandparents, Mila and Buford, who had filed a suit in intervention, decided to not pursue custody of Mary after seeing how happy she was with the foster family. Mila testified that it was best for the children to remain together. In addition, Mila and Buford had established a bond with the foster family; D.S. testified that the they had become D.S.'s and C.C.'s pseudo-parents and visited often.

Appellant did not provide TDFPS with any other relatives as placements.

28

**E. The acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of appellant**

As for the parent-child relationship, there is evidence that John felt that he was the protector of his siblings and often referred to them as his children. John had gradually let go of his protector role since being with his foster family although he still worried about Mary and Tom when they were not with him. John had worried about Tom before he was removed.

The evidence demonstrates that appellant claimed that she did not know who caused Mary's injuries nor did she appear appropriately concerned for Mary at the hospital. However, Chapman testified that Mary would have been screaming when the injuries occurred so appellant's testimony that she did not know who or how the injuries were caused is doubtful. Additionally, appellant stated that Mary's head trauma could have been caused by falling off the bed, but doctors explained that Mary's head injury was the type of injury that was the equivalent of falling from a two-story building. Appellant also stated that Mary might have consumed dish soap, but the doctors believed the intraoral burns were caused by being force fed hot food or by a chemical burn. Appellant explained Mary's broken fingers by claiming that John had pushed a toy truck over Mary's hand and then sat on the truck. However, pediatric nurse McNeil, who examined John immediately after he was removed, testified that

29

she doubted that John would have had the physical ability to pull himself onto a toy truck. D.S. also testified that when John first came to live with her family, he could not pull himself onto a chair or toy because he lacked the upper body strength. Thus, appellant's explanations for Mary's injuries were highly unlikely.

Additionally, appellant's story regarding the whereabouts of McBride on February 24, 2006, were inconsistent although she had always stated that she was at home. Appellant told psychologist Wiggins that she thought McBride may have injured Mary, but at the time of that interview, appellant still lived with him. Appellant also did not know if McBride's daughter Allison was responsible for Mary's injuries, and appellant continued to live with her for a short time after the children were removed. Appellant also failed to tell Wiggins about Mary's additional injuries. Wiggins testified that appellant knew that TDFPS could terminate her parental rights, so she was not surprised that appellant was not forthright.

Moreover, appellant did not appear to understand the seriousness of Mary's injuries before or after her children were removed. For example, appellant and her mother would swing Mary around during visits, which was a dangerous activity because of the unprotected area on her head.

30

The evidence also shows that appellant did not secure the appropriate medical equipment or therapy for John. There is evidence that John had leg braces and received therapy in Missouri, but appellant failed to continue these services when she moved to Texas with McBride, which caused John's development to regress significantly.

In sum, the record demonstrates that although appellant diligently completed her services, the severity of Mary's injuries, TDFPS's uncertainty as to the identity of the person or persons who inflicted the injuries, along with appellant's continued failure to grasp the severity of those injuries, her denial of the intent and nature of the injuries, her failure to inform TDFPS of her new boyfriend, and the intentional neglect of the children, all demonstrate that it was in John's , Mary's, and Tom's best interests that appellant's parental rights be terminated. *See* TEX. FAM. CODE ANN. § 161.001(2).

Viewing all the evidence in the light most favorable to the judgment, we hold that the evidence is legally sufficient to support the trial court's finding that termination of appellant's parental rights was in the children's best interest. *See id*. Viewing the same evidence in a neutral light, we hold that it is also factually sufficient to support the trial court's findings that termination of appellant's parental rights was in the children's best interest. *See id.* We overrule appellant's two issues.

31

**Conclusion**

Having overruled all of appellant's issues, we affirm the trial court's judgment terminating appellant's parental rights to John, Mary, and Tom.


TERRIE LIVINGSTON
JUSTICE

PANEL B:   LIVINGSTON, HOLMAN, and GARDNER, JJ.

DELIVERED: June 5, 2008

32